STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

YOOSUN KOH (NYBN 5245220)
Assistant United States Attorney

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-7034
     FAX: (415) 436-7234
     Yoosun.Koh@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>BENNIE POWELL JR.,<br><br>    Defendant. | **CASE NO. CR 21-00070 RS**<br><br>**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**<br><br>Court:        Videoconference<br>Hearing Date:  January 3, 2022<br>Hearing Time:  1:00 p.m. |

1

## **TABLE OF CONTENTS**

2    INTRODUCTION ............................................................................................................1

3    FACTUAL BACKGROUND ..........................................................................................2

4    ARGUMENT ..................................................................................................................3

5    I.      The Search Warrant Affidavit Established Probable Cause ..............................3

6            A.      The Search Warrant Affidavit Set Forth a Fair Probability that the Alleged
                     Crimes of Forgery and Possession of Stolen Property Had Been Committed....................4

7            B.      Defendant's Arguments Challenging Probable Cause Lack Merit........................................8

8            C.      The Search Warrant Affidavit Established a Fair Probability that Evidence of
9                    Forgery and Possession of Stolen Property Would Be Located in the
                     Residence, BMW and Other Vehicles, and Electronic Devices. ........................................11

10   II.     The Warrant Described the Items to be Seized with Sufficient Particularity and Was
11   Not Overbroad. ..............................................................................................................14

12           A.      The Electronics Provision was Sufficiently Particular and Not Overbroad. ....................15

13           B.      The Counterfeit Money Orders Provision was Sufficiently Particular..............................19

14   III.    Suppression is Unwarranted Because the Government's Search Was Conducted in
15   Good Faith. .....................................................................................................................20

16   CONCLUSION...............................................................................................................21

17

18

19

20

21

22

23

24

25

26

27

28

1

# **TABLE OF AUTHORITIES**

2

3

## **CASES**

4

*Illinois v. Gates,*
    462 U.S. 213 (1983)......................................................................................................... 5, 9, 10, 12

5

*Krull v. Illinois,*
    480 U.S. 340 (1987)......................................................................................................................... 21

6

7

*In re Grand Jury Subpoenas Dated Dec. 10, 1987,*
    926 F.2d 847 (9th Cir.1991) ......................................................................................................... 16

8

*Rutherford v. Cupp,*
    508 F.2d 122 (9th Cir. 1974) ........................................................................................................ 12

9

10

*United States v. Abboud,*
    438 F.3d 554 (6th Cir. 2006) ....................................................................................................... 6, 7

11

*United States v. Adjani,*
    452 F.3d 1140 (9th Cir. 2006) ........................................................................................ 1, 15, 16, 20

12

13

*United States v. Angulo-Lopez,*
    791 F.2d 1394 (9th Cir. 1986) ...................................................................................................... 12

14

*United States v. Arias-Villanueva,*
    998 F.2d 1491 (9th Cir. 1993) ...................................................................................................... 15

15

16

*United States v. Becerril,*
2019 WL 162728 (N.D. Cal. Jan. 10, 2019)......................................................................... 10, 11

17

*United States v. Bohannon,*
    2020 WL 7319430 (N.D. Cal. Dec. 22, 3030) ............................................................................... 1

18

*United States v. Calandra,*
    414 U.S. 338 (1974)......................................................................................................................... 22

19

20

*United States v. Carney,*
    675 F.3d 1007 (6th Cir. 2012) ................................................................................................ 8, 9, 10

21

*United States v. Cervantes,*
    703 F.3d 1135 (9th Cir. 2012) ...................................................................................................... 11

22

23

*United States v. Crews,*
    502 F.3d 1130 (9th Cir. 2007) ........................................................................................................ 6

24

*United States v. Crozier,*
    777 F.2d 1376 (9th Cir. 1985) ...................................................................................................... 19

25

*United States v. Davis,*
    530 F.3d 1069 (9th Cir. 2008) ........................................................................................................ 9

26

27

*United States v. Dennis,*
    625 F.2d 782 (8th Cir. 1980) ........................................................................................................ 18

28

*United States v. Dubrofsky,*
    581 F.2d 208 (9th Cir. 1978) ....................................................................................................... 7, 8

*United States v. Duegaw,*
   150 Fed. Appx. 803 (10th Cir. 2005) ................................................................................. 10

*United States v. Farias,*
   2012 WL 12888370 (N.D. Cal. Nov. 20, 2012) ................................................................. 5

*United States v. Gagnon,*
   635 F.2d 766 (10th Cir.1980) .......................................................................................... 12

*United States v. Gourde,*
   440 F.3d 1065 (9th Cir.2006) ............................................................................................ 9

*United States v. Hay,*
   231 F.3d 630 (9th Cir. 2000) ..................................................................................... 17, 20

*United States v. Hayes,*
   794 F.2d 1348 (9th Cir. 1986) ........................................................................... 16, 18, 19

*United States v. Herring,*
   555 U.S. 135 (2009) ..................................................................................................... 21, 22

*United States v. Hillyard,*
   677 F.2d 1336 (9th Cir. 1982) .......................................................................................... 19

*United States v. Holzman,*
   871 F.2d 1496 (9th Cir. 1989) ..................................................................................... 14, 19

*United States v. Kahre,*
   737 F.3d 554 (9th Cir. 2013) ............................................................................................ 15

*United States v. Krupa,*
   658 F.3d 1174 (9th Cir. 2011) ............................................................................................ 5

*United States v. Kunkler,*
   679 F.2d 187 (9th Cir. 1982) ............................................................................................ 13

*United States v. Lacy,*
   119 F.3d 742 (9th Cir. 1997) ..................................................................................... 17, 20

*United States v. Leon,*
   468 U.S. 897 (1984) ..................................................................................................... 21, 22

*United States v. Meek,*
   366 F.3d 705 (9th Cir. 2004) ............................................................................................ 21

*United States v. Poland,*
   659 F.2d 884 (9th Cir. 1981) ............................................................................................ 13

*United States v. Rice,*
   134 Fed. Appx. 839 (6th Cir. 2005) ................................................................................. 10

*United States v. Rubio,*
   727 F.2d 786 (9th Cir.1983) .......................................................................................... 3, 7

*United States v. Schesso,*
   730 F.3d 1040 (9th Cir. 2013) ............................................................................................ 5

*United States v. SDI Future Health, Inc.,*
    568 F.3d 684 (9th Cir. 2009) ................................................................................................ 16

*United States v. Spilotro,*
    800 F.2d 959 (9th Cir.1986) ...................................................................................... 16, 17, 18

*United States v. Tiem Trinh,*
    665 F.3d 1 (1st Cir. 2011) .................................................................................................... 16

*United States v. Underwood,*
    725 F.3d 1076 (9th Cir. 2013) ......................................................................................... 8, 11

*United States v. Ventresca,*
    380 U.S. 102 (1965) ....................................................................................................... 6, 7, 8

*United States v. Washington,*
    782 F.2d 807 (9th Cir.1986) ................................................................................................ 18

The United States hereby files its Opposition to Defendant Bennie Powell Jr.'s Motion to Suppress ("Mot."). (Dkt. 84). This Opposition is based upon the files and records of the case together with the following statement of facts and memorandum of points and authorities.

## INTRODUCTION

On November 21, 2019, California Superior Court Judge Tim Kam, a neutral and detached official, issued a warrant to search Defendant's home, vehicles, person, and electronic devices after reaching an independent judgment that the facts and opinions set forth in Postal Inspector Singh's affidavit established a fair probability that evidence, fruits, contraband, and instrumentalities of forgery, possession of stolen property, and other criminal offense would be found in those locations. In challenging probable cause, Defendant fails to employ "the principles of *Gates*-practicality, common sense, a fluid and nontechnical conception of probable cause, and deference to the magistrate's determination." *United States v. Adjani*, 452 F.3d 1140, 1145 (9th Cir. 2006).

Defendant's first set of arguments attempt to create issues in the affidavit where none exist. He attacks the affiant's determination that the five postal money orders that the Defendant negotiated at Westamerica Bank were "counterfeit" as "conclusory allegations and conjecture" when, in fact, the affidavit described in detail not only the transactions in question, but the source of that information. Next, Defendant dismisses reports from the bank's loss investigators and the U.S. Postal Service Money Order Verification Unit as "conclusory allegations [...] made by unsworn third parties about whom the judge knew absolutely nothing except their name or title." He demands that an unreasonable level of scrutiny, typically reserved for confidential criminal informants, apply to information provided by the victim bank's employees (whose job is to investigate fraudulent transactions) and a component of the United States Postal Service (that is specifically tasked with checking suspicious money orders). His other allegation—that the "any vehicles" provision is overly broad—discounts the role that common sense plays in drawing reasonable inferences about where evidence of counterfeiting and identity theft are likely to be located and the value of an experienced agent's opinions based on training and experience.

His second set of arguments fare no better. Even the broadest categories of items that the warrant authorized to search and seize were limited by reference to specific criminal activities and a three-month

1   time period.  Furthermore, the affidavit, which was attached to and incorporated in the warrant, provided

2   sufficient guidance that appropriately limited the executing officers' discretion in identifying the items

3   to be searched and seized.

4       Finally, even if the Court finds there was not a substantial basis to support a finding of probable

5   cause, it should still deny the motion because the execution of the warrant falls within the good faith

6   exception.

7   <center>**FACTUAL BACKGROUND**</center>

8       On November 15, 2019, Donna Cory, a Loss Investigator at Westamerica Bank, contacted Postal

9   Inspector Tyler Sherman about five counterfeit U.S. Postal Service money orders, each in the amount of

10   $1,000, that an individual negotiated at Westamerica Bank's Vallejo branch on the previous day.  On

11   November 18, 2019, Loss Investigator Cory emailed images of the individual who had negotiated the

12   counterfeit money orders and copies of the five counterfeit money orders to Inspector Sherman.  The

13   images were still shots taken from the Westamerica Vallejo branch's surveillance video footage on

14   November 14, 2019.

15       Loss Investigator Cory explained to Inspector Sherman that she had called the U.S. Postal

16   Service Money Order Verification Unit and told that the five money orders that the individual had

17   negotiated were not valid.  Cory sent the serial numbers of the five money orders to the Verification

18   Unit.

19       On November 19, Postal Inspector Sherman spoke with Tammira Day, another Loss Investigator

20   at Westamerica Bank.  This time, Loss Investigator Day told Inspector Sherman that the same individual

21   who had transacted the counterfeit money orders at the bank's Vallejo branch also tried to cash three

22   additional money orders at the bank's Fairfield branch, and emailed him two images of the individual

23   taken from the Fairfield branch's surveillance video footage.  She also informed him that Westamerica

24   Bank had incurred a $5,000 loss as a result of these transactions.  Day gave Sherman the personal

25   identifying information that the individual supplied on his bank account application, including his

26   purported name "Timothy Sears," an address of "1001 Spyglass Parkway, Vallejo, CA 94591.

27

28

Postal Inspector Sherman compared the surveillance footage images from Vallejo branch and Fairfield branch and determined that it was the same individual who cashed or attempted to cash the postal money orders on both occasions.

On November 19, 2019, Inspector Sherman conducted follow-up investigation.  He spoke with the property manager at 1 Spyglass Parkway, who positively identified the individual shown in one of the bank images as an individual, Timothy Sears, who lived in the complex.  Sherman also researched postal indices and found that "Timothy M. Sears" was receiving mail at 1001 Spyglass Parkway.

Based on the facts recited above, Postal Inspector Singh drafted a search warrant affidavit.

## ARGUMENT

### I.    The Search Warrant Affidavit Established Probable Cause

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV.  This showing requires only a "fair probability, not certainty," that the items sought are contraband, fruits, or evidence of crime, and that they are now at the location to be searched.  *United States v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011).  Moreover, whether an affidavit in support of a search warrant shows probable cause should be considered under the "totality of the circumstances," *Illinois v. Gates*, 462 U.S. 213 (1983).  "[P]iece-meal analysis" is therefore "contrary to the standard articulated in *Gates*." *United States v. Farias*, No. CR 11-00647 RS, 2012 WL 12888370, at *3 (N.D. Cal. Nov. 20, 2012), *aff'd sub nom. United States v. Farias-Sanchez*, 585 F. App'x 551 (9th Cir. 2014).

When considering whether the magistrate had a substantial basis to conclude that the warrant was supported by probable cause, the reviewing court should give "great deference" to a magistrate's probable cause determination.  *United States v. Bohannon*, No. 19-CR-00039 CRB, 2020 WL 7319430, at *6 (N.D. Cal. Dec. 22, 3030) (quoting *United States v. Schesso*, 730 F.3d 1040, 1045 (9th Cir. 2013)).  Where a magistrate has found probable cause, this finding should "not be reversed absent a finding of clear error." *United States v. Pitts*, 6. F.3d 1366, 1369 (9th Cir. 1993).  "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be

accorded to warrants."  *United States v. Ventresca*, 380 U.S. 102, 109 (1965).  *See also United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007) ("In borderline cases, preference will be accorded to warrants and to the decision of the magistrate issuing it.").

As set forth below, the search warrant here was supported by probable cause, because the affidavit established a "fair probability" that the alleged crime(s) of forgery and possession of stolen property had been committed, and contraband or evidence of these crimes were located at the 1001 Spyglass Parkway (the "Residence"), the white or silver BMW and any other vehicles associated with the Residence, and computers, cell phones and other electronic media devices found at the Residence.

### A.   The Search Warrant Affidavit Set Forth a Fair Probability that the Alleged Crimes of Forgery and Possession of Stolen Property Had Been Committed.

As an initial matter, to justify the issuance of a warrant, an affidavit need only contain facts that indicate a fair probability that evidence of at least one of the alleged crimes in the affidavit will be located in the place to be searched.  *See United States v. Abboud*, 438 F.3d 554 (6th Cir. 2006) (where magistrate approved the warrant only with respect to bank fraud, but search warrant affidavit (which was incorporated by reference into the warrant to support the finding of probable cause) also listed additional offenses, the reviewing court limited its probable cause analysis to the bank fraud violation).  For the reasons set forth below, Postal Inspector Singh's affidavit established probable cause that the crimes of forgery and possession of stolen property were committed.

While the government maintains that the affidavit also supplied probable cause for identity theft and conspiracy, this response focuses on the probable cause analysis for forgery and possession of stolen property because the affidavit contains a stronger factual basis for these offenses.  If the Court find that the affidavit established probable cause for either forgery or possession of stolen property, it need not address the additional alleged offenses of identity theft and conspiracy.

Postal Inspector Singh's affidavit in support of the search warrant described two separate transactions involving counterfeit postal money orders that occurred within several days of each other, at two different Westamerica Bank branches.  SW Aff. ¶¶ 6-8.  On November 14, 2019, the individual negotiated five counterfeit postal money orders, in the amount of $1,000 each, at Westamerica's Vallejo branch.  *Id.* ¶ 6.  Sometime between November 14 and November 19, 2019, the same individual visited

Westamerica's Fairfield branch and tried to cash three additional postal money orders. *Id.* ¶ 8.
Westamerica Bank suffered a loss of approximately $5,000 as a result of the foregoing transactions or
attempted transactions. The affiant noted that the same individual, who identified himself as "Timothy
Sears" on his bank account application, *id.* ¶ 9, negotiated or attempted to negotiate the money orders at
the Vallejo branch and Fairfield branch. *Id.* ¶¶ 8-9. He also stated that this individual was captured on
bank surveillance footage at both branches, and, based on his review of the images, it appears to be the
same person on both occasions. *Id.* ¶ 9.

Without more, Defendant's criticism that the affidavit rested heavily on "conclusory allegations
and conjecture" that cannot be used to establish probable cause might have found their mark. Mot. at 4.
An affidavit must recite underlying facts so that the issuing judge can draw his or her own reasonable
inferences and conclusions; it is these facts that form the central basis of the probable cause
determination. *United States v. Ventresca,* 380 U.S. 102, 108–09 (1965); *United States v. Rubio,* 727
F.2d 786, 795 (9th Cir.1983) ("The magistrate must be provided with sufficient *facts* from which he may
draw the inferences and form the conclusions necessary to a determination of probable cause.")
(emphasis added); *United States v. Dubrofsky,* 581 F.2d 208, 212 (9th Cir.1978) ("A search warrant may
not rest upon mere affirmance or belief without disclosure of supporting facts or circumstances.").

But Postal Inspector Singh's affidavit contained *much more*. The affidavit also described in
detail how the Westamerica Bank loss investigators determined that the money orders were in fact
"counterfeit" and reported the suspicious activity to law enforcement. It stated that on November 15,
2019, Loss Investigator Cory contacted Postal Inspector Sherman and told him that five counterfeit
postal money orders were negotiated at Westamerica's Vallejo branch the previous day. *Id.* ¶ 6.
Sometime between November 15 and November 18, Cory called the U.S. Postal Service Money Order
Verification Unit, gave the serial numbers of the five suspicious counterfeit money orders, and was
informed that the money orders were "not valid." *Id.* ¶ 7. On November 18, she emailed the 'evidence'
she had gathered—copies of the five counterfeit money orders and surveillance video images of the
individual who negotiated the money orders at the bank's Vallejo branch—to Sherman. *Id.*

Based on this information, Sherman continued to investigate. The affidavit states that on
November 19, he spoke with Loss Investigator Day, who was the bank's investigator in this case. *Id.* ¶

8. Day reported that the same individual who had negotiated the five counterfeit money orders at the bank's Vallejo branch also visited the Fairfield branch and "tried to cash three (3) additional Money Orders." *Id.*  She also told Sherman that Westamerica Bank had incurred approximately $5,000 in losses due to these transactions. *Id.*  Either Postal Inspector Sherman or Postal Inspector Singh examined the surveillance photos from the Fairfield branch and from the Vallejo branch, and based on this comparison, determined that the same person tried to pass the counterfeit money orders on both occasions. *Id.*  The bank's surveillance footage also included an image of a white or silver BMW Sedan, which the individual drove to leave the bank on November 14.

The affidavit further stated that the individual submitted a Westamerica bank account application that listed his name as "Timothy Sears," his address as "1001 Spyglass Parkway, Vallejo, CA 94591," a Georgia Driver's License number, a telephone number, and information about his employer. *Id.* ¶ 9.  Postal Inspector Sherman researched postal indices and confirmed that an individual named "Timothy M. Sears" was receiving mail at 1001 Spyglass Parkway. *Id.* ¶ 11.  He also spoke with the property manager of the multi-apartment building in which 1001 Spyglass Parkway is located, and the property manager confirmed that the individual shown in an image from Westamerica Bank's surveillance footage lived in the complex. *Id.* ¶ 10.

Taken together, the affidavit contained sufficient "underlying facts" for "the issuing judge…[to] draw his or her own reasonable inferences and conclusions" that there was a fair probability that the crime of forgery had been committed. *See United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013) (citing *Ventresca*, 380 U.S. at 108-09).  In *United States v. Carney*, the Sixth Circuit confronted an almost identical set of facts in a search warrant affidavit and found probable cause for counterfeiting. 675 F.3d 1007, 1012-13 (6th Cir. 2012).  There, the affidavit described two separate transactions involving different denominations of counterfeit money that occurred in the same area and within a week of each other. *Id.* at 1012.  On the first occasion, a boy and his mother reported to the police that a man later identified as Carey paid them with counterfeit bills and then drove away in a white Chevy SUV. *Id.* at 1008.  The following week, a convenience store manager reported to police that Carney attempted to pass a counterfeit $20 bill to pay for merchandise, and that he left the scene in a white

Chevy SUV.[1]  The Sixth Circuit held that "based on the totality of the circumstances, the supporting affidavit established a fair probability that evidence of counterfeiting would be found in the apartment and car."  *Id.* at 1012.

In addition, the affidavit alleged facts sufficient to establish probable cause for possession of stolen property.  It is undisputed that the magistrate judge was presented with the following information: (1) five counterfeit postal money orders with serial numbers 26254673932, 26254673954, 26334006131, 26334006221, and 26334006074, were negotiated at Westamerica Bank, (2) the U.S. Postal Service checked these serial numbers and confirmed that the money orders were not valid, and (3) the bank sustained around $5,000 in losses in connection with the foregoing transactions.  SW Aff. ¶¶ 6-8.  In the "Training and Experience" section of the affidavit, Postal Inspector Singh states that he knows "counterfeiters will often use computers or other electronic devices to design counterfeit Money Orders" and "[g]ood counterfeiters will print or produce large quantities of Money Orders and have mules or innocent subjects cash them at financial institutions."  *Id.* ¶ 12(a).

Based on this information, a magistrate judge could draw his or her own reasonable conclusions about how the counterfeit money orders were created and how the individual came to be in possession of them.  Probable cause determinations may be based in part on reasonable inferences. *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (citing *United States v. Gourde,* 440 F.3d 1065, 1071 (9th Cir.2006) (en banc)); *see also Gates*, 462 U.S. at 240 (noting that a magistrate judge may "draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant").  The natural and reasonable inference is that a "counterfeiter" designed and printed money orders with made-up serial numbers, or the money orders were genuine U.S. Postal Service-issued money orders bearing real serial numbers that were stolen from the U.S. Postal Service (or stolen from the legitimate purchaser or recipient) and someone forged the payment information on the orders before cashing them.[2]

---

[1] The affidavit also stated that law enforcement confirmed that Carney appeared in the store's surveillance video.  The affiant also noted that law enforcement observed the white Chevy SUV parked in front of an address that Carney's parole officer confirmed as a known address for Carney.  Finally, the affidavit stated that police drove to this address, knocked on the door, and Carney answered the door.

[2] Defendant attacks the affidavit for failing to establish probable cause for mail theft.  *See* Mot. at 7 ("The affidavit, however, utterly fails to establish that the man committed mail theft.").  But nowhere in the affidavit or supporting documents does Postal Inspector Singh make any claim that there is probable cause that the crime of mail theft has been committed or that evidence of mail theft may be found in the

B.      **Defendant's Arguments Challenging Probable Cause Lack Merit.**

Defendant presents two arguments challenging probable cause for forgery: *first*, that Loss Investigator Cory's and the U.S. Postal Service Verification Unit's determinations that the money were "counterfeit" and "not valid" cannot be used to establish probable cause;, and *second*, that the magistrate judge could not rely on hearsay statements of "unsworn third parties" to find probable cause; and *third*, Neither argument has merit.

1.      **Loss Investigator Cory and USPS Verification Unit Reports Supplied "Underlying Facts" for Probable Cause Determination.**

Citing *United States v. Underwood* and *United States v. Cervantes*, Defendant argues that "Cory's and the Verification Unit's claims that the money orders were 'counterfeit' or 'not valid'" are not supported by any underlying facts.  Mot. at 5.  Nor does the affidavit explain the meaning of these terms or how the bank and U.S. Postal Service determined that the suspicious money orders were, respectively, "counterfeit" and "not valid".  *Id.*

Defendant's allegation, while factually correct, does not undermine the probable cause finding. Courts have consistently held that an affidavit that reports from businesses or police about transactions involving counterfeit money or counterfeit money orders supplied probable cause to search for evidence of counterfeiting without further inquiry into how and why the bills or money orders were deemed "counterfeit."  *See e.g.*, *Carney*, 675 F.3d at 1012 (affidavit described two separate transactions involving different denominations of counterfeit money reported by convenience store manager and individuals who received counterfeit bills as payment); *United States v. Duegaw*, 150 Fed. Appx. 803, 805 (10th Cir. 2005) (search warrant affidavit that stated defendant's traveling companion had attempted to cash a fraudulent money order while defendant waited outside in their car and defendant provided police with false identification established probable cause); *Rice v. United States*, 134 Fed. Appx. 839, 8840-41 (6th Cir. 2005) (affidavit that recited statement by defendant's girlfriend, who had just been caught attempting to pass a counterfeit $50 bill at a gas station, that she had obtained counterfeit bills from him at his home was sufficient to establish probable cause).

---

location to be searched.

Furthermore, Defendant's reliance on *Underwood* and *Cervantes* is misplaced because these cases demonstrate that only the most conclusory affidavits bereft of underlying facts will disturb a magistrate judge's finding of probable cause.   In *Underwood*, the Ninth Circuit held that a state search warrant affidavit failed to provide a sufficient basis for probable cause for ecstasy trafficking where it contained the affiant's statement, "[b]ased on other seizures in the investigation, I believe the crates [that defendant delivered to co-conspirators] contained approximately 260,000 pills of MDMA."  725 F.3d at 1083.  This statement was a "bare conclusion" because it provided "no underlying facts about the seizures from which the issuing judge could draw his or her own conclusion about how, if at all, the seizures indicate that the two crates contained ecstasy."  *Id.*  Likewise, in *Cervantes*,[3] the court afforded little if any weight to a detective's conclusory statement that, "based on [his] training and experience," a box in defendant's possession came from a "suspected narcotics stash house."  *United States v. Cervantes* 703 F.3d 1135, 1139-40 (9th Cir. 2012) ("While Hankel's training and experience are factors to be considered, "it is incumbent upon the arresting or searching officer to explain the nature of his expertise or experience and how it bears upon the facts which prompted the officer to arrest or search.").

The affidavit in this case, by contrast, included detailed "underlying facts" to support Postal Inspector Singh's conclusion that the postal money orders were "counterfeit."  Instead of making a vague reference to 'conversations with the bank' or 'training and experience,' as the basis for his statement, the affidavit recited what Loss Investigators Cory and Day told Inspector Sherman (an individual had cashed five counterfeit postal money orders and a few days later attempted to cash additional money orders), the steps that Cory took to verify the money orders (called the USPS Money Order Verification Unit and provided serial numbers), and Postal Inspectors received copies of the suspicious money orders and surveillance footage images of the suspect).  This enabled the magistrate judge to assess for himself the persuasiveness of the facts relied upon by the affiant and "draw the inferences and form the conclusions necessary to a determination of probable cause."  *See Underwood*, 725 F.3d at 1081 (quoting and citing *United States v. Rubio*, 727 F.3d at 795).

---

[3] *Cervantes* concerned a warrantless search of defendant's vehicle, but the same probable cause standard applied.

2.      **Hearsay Statements of Citizen Informants with No Motive for Fabrication Are More Reliable and Can Supply Probable Cause.**

Defendant's second contention—that the loss investigators' statements cannot be used to establish probable cause because they are "conclusory statements" by "unsworn third parties"—fares no better. Mot. at 5-6. As a starting point, Defendant fails to state, let alone apply, the standard for assessing hearsay statements by informants. To determine whether information provided by informants establishes probable cause, a magistrate looks to the "totality of the circumstances." *Gates*, 462 U.S. at 228. Evidence bearing on the veracity of the informant and his or her basis of knowledge is considered together with other relevant evidence in making the probable cause determination based on the totality of the circumstances. *United States v. Angulo-Lopez*, 791 F.2d 1394, 1396-97 (9th Cir. 1986) (citations omitted).

Citizen informants, while not carrying the same presumption of reliability as police officers, require less evidence to establish their veracity than criminal informants. *Angulo-Lopez*, 791 F.2d at 1397. A citizen informant's veracity may be established by the "absence of an apparent motive to falsify and independent police corroboration of the details provided by the informant." *Id.* (citing *United States v. Gagnon,* 635 F.2d 766, 768 (10th Cir.1980), *cert. denied,* 451 U.S. 1018 (1981) and *Rutherford v. Cupp,* 508 F.2d 122, 123 (9th Cir. 1974), *cert. denied*, 421 U.S. 933 (1975)).

Defendant's allegation that the magistrate judge lacked information to assess the reliability of Loss Investigator Cory's statements is contradicted by the facts. First, as a citizen informant, she had "no ulterior motive for providing false information," *Gagnon*, 635 F.2d at 768. To the contrary, as a loss investigator for Westamerica Bank, it was her job to investigate suspicious activities and transactions that caused financial loss to the bank and truthfully report fraudulent transactions to law enforcement. Second, Cory had personal knowledge about the five counterfeit money orders that Defendant negotiated at the Westamerica Vallejo branch because she inspected them, gave their serial numbers to the U.S. Postal Service Money Order Verification Unit, and received confirmation from the Verification Unit that they were not valid. SW Aff. ¶¶ 6-7. While the U.S. Postal Service Money Order Verification Unit is not part of law enforcement, it is a component of the U.S. Postal Service, a federal government agency that may be presumed more reliable than most other categories of informant. *See*

1   *generally United States v. Kunkler*, 679 F.2d 187, 190 (9th Cir. 1982) ("Police officers are considered

2   reliable and their reliability need not be independently demonstrated.").

3        Furthermore, the affidavit established that Postal Inspector Sherman and Singh corroborated

4   some of the information provided by Cory and Day, including that the same individual who negotiated

5   the five counterfeit orders at the Vallejo branch (according to Cory) also attempted to cash additional

6   money orders at the Fairfield branch (according to Day) by reviewing the surveillance footage images

7   from both banks.  *Id.* ¶ 8.  Day also provided the individual's bank account application information, and

8   the postal inspectors confirmed the accuracy of the individual's name and address through their own

9   research and investigation.  *Id.* ¶¶ 9.  Accordingly, the magistrate judge could have reasonably credited

10  Loss Investigator Day's and the U.S. Postal Service Money Order Verification Unit's statements and

11  relied on them to find probable cause.

12      **C.    The Search Warrant Affidavit Established a Fair Probability that Evidence of
             Forgery and Possession of Stolen Property Would Be Located in the Residence,**

13           **BMW and Other Vehicles, and Electronic Devices.**

14       Defendant does not meaningfully contest that the affidavit established probable cause to search

15  his Residence, the BMW, and electronic devices, as further described in Attachment A to the warrant.

16  His challenge is limited to item number 2 on Attachment A: any vehicles "parked at the premises" or

17  "under the dominion and control of subjects encountered, which can be identified as being associated

18  with this location, by keys, documents, statements or DMV records…"  Def. Ex. A. (Search Warrant

19  Attachment A ("SW Attachment A").  That challenge fails because Postal Inspector Singh's affidavit

20  provided sufficient facts to support a reasonable inference that evidence of forgery/counterfeiting or

21  possession of stolen property would be found in any vehicle that had a significant nexus with the

22  residence at 1001 Spyglass Parkway.

23       Direct evidence linking criminal objects to a particular site is not required for the issuance of a

24  search warrant. *United States v. Poland,* 659 F.2d 884, 897 (9th Cir. 1981), *cert. denied,* 454 U.S. 1059

25  (1981).  A magistrate need only determine that "a fair probability exists of finding evidence, considering

26  the type of crime, the nature of items sought, the suspect's opportunity for concealment and normal

27  inferences about where a criminal might hide stolen property."  *United States v. Holzman*, 871 F.2d

28  1496, 1510–11 (9th Cir. 1989) (internal quotation marks and citations omitted), *abrogated on other*

1   grounds by *Horton v. California*, 496 U.S. 128 (1990); *see also Carney*, 675 F.3d at 1013 ("a purveyor

2   of counterfeit bills of different denominations on different occasions may be expected to have evidence

3   of that activity in his home."); *United States v. Tate*, 586 F.3d 936, 943 (11th Cir. 2009) ("evidence that

4   a defendant has stolen material which one normally would expect him to hide at his residence will

5   support a search of the residence"); *United States v. Gunter*, 551 F.3d 472, 481 (6th Cir. 2009) ("[I]t was

6   reasonable to infer that evidence of illegal activity would be found at Gunter's residence.").

7          Postal Inspector Singh's affidavit contained several investigative facts that, taken together,

8   revealed interweaving connections among the individual who held himself out as "Timothy Sears," his

9   residence at 1001 Spyglass Parkway Residence, and any vehicles that he could use to drive between his

10  residence and the banks at which he cashed counterfeit postal money orders.  It stated that the individual

11  who transacted the counterfeit postal money orders at Westamerica Bank submitted an account

12  application with "1001 Spyglass Parkway, Vallejo, CA 94591" as his address.  SW Affidavit ¶ 9.  Postal

13  Inspector Sherman spoke with the property manager of the multi-unit apartment building, who

14  confirmed that the individual who passed those counterfeit money orders resided at this address.  *Id.* ¶

15  10.  He also researched postal indices and found that a "Timothy M. Sears" was receiving mail at this

16  address.  *Id.* ¶ 11.  The BMW that the individual drove to leave Westamerica Bank after conducting the

17  fraudulent transactions on November 14, 2019 was parked at this address.  SW Attachment A.

18         Just as someone who transacts counterfeit money on multiple occasions may be expected to keep

19  additional counterfeit bills and equipment used to create those bills, *Carney*, 675 F.3d at 1013, a thief

20  may be expected to have stolen goods in his home*, see Tate*, 586 F.3d at 943, or a drug dealer may be

21  expected to have evidence of drug activity in his home, *see Gunter*, 551 F.3d at 481, a magistrate judge

22  could reasonably infer that someone who passes counterfeit postal money orders at banks would have

23  evidence of his criminal activities, such as additional counterfeit money orders, postal money order

24  stock, bank receipts, and identification documents, at his home, on his person, or in the cars that he

25  drove to and from the banks where he cashed counterfeit money orders.

26         This inference is also supported by common sense.  If "Timothy Sears" designed and printed the

27  counterfeit money orders himself, he would most likely do this at home where he is likely to keep his

28  computer, color printer, and other equipment used for counterfeiting.  As the affidavit stated under the

1   "Training and Experience" section, counterfeiters often use computers to design counterfeit money

2   orders and print them on modern color copiers and computer printers; these items are also the type that

3   one would typically keep at home.  SW Affidavit ¶ 12(a).  If "Timothy Sears" altered payment

4   information on genuine money orders issued by the U.S. Postal Service that he stole or received from a

5   third party who stole them, then it is also likely that he would keep the stolen property at his home.

6   Under either scenario, he would likely carry the counterfeit money orders to the bank where he intended

7   to cash them either on his person or in a car that he drove from his home to the bank.

8       Defendant cites *United States v. Becerril*, a case decided by Judge Hamilton in this district, in

9   support of his argument.  Mot. at 10.  He includes a parenthetical that states, in sum and substance, that

10  the affidavit established a nexus to the suspect's vehicle where "the affiant offered expert opinion that

11  mail thieves will generally store the stolen mail in their personal vehicles and/or at their residence, and

12  that mail thieves commonly carry and transport the fruits and instrumentalities in their vehicles."  By

13  contrast, he argues, no probable cause existed to search the cars here because Postal Inspector Singh did

14  not even claim that, in his training and experience, evidence or fruits of the alleged crimes are usually

15  stored in the suspects' cars.  Mot. at 10.  But the parenthetical only tells half the story.  The court also

16  found that "this inference [that evidence of defendant's mail theft would be found in his cars] is also

17  supported by *common sense*, given that defendant would not likely store the stolen mail at his place of

18  work, where he stole the Costco certificates in the first place."  No. 18-CR-00288-PJH, 2019 WL

19  162728, at *1 (N.D. Cal. Jan. 10, 2019) (emphasis added).

20      Accordingly, based on the facts contained in Postal Inspector Singh's affidavit and common

21  sense, a magistrate judge could reasonably infer that evidence of forgery and possession of stolen

22  property would be found not only in the BMW, but "any vehicles" that "Timothy Sears" was likely to

23  use to store and transport counterfeit money orders from his residence to the bank.  Probable cause for

24  the warrant thus extended so far as to cover any vehicles that had a sufficient nexus to the suspect's

25  residence at 1001 Spyglass Parkway.  These included any vehicles "parked at the premises" or "under

26  the dominion and control of subjects encountered" with the critical qualifier that they must be

27  "associated with this location, by keys, documents, statements or DMV records."  *See Adjani*, 452 F.3d

28  at 1146 (probable cause to search all computers found in suspect's residence and to which he had

apparent access, including one that he did not own, because "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought") (internal quotation marks omitted).

Finally, while the government disagrees with the factual and legal basis for the defendant's argument and maintains that the affidavit established probable cause to search "any vehicles" as described in Attachment A, it has decided not to use the evidence seized from the Infiniti SUV if this case proceeds to trial.  Therefore, defendant's Fourth Amendment claim with respect to evidence seized from "any vehicle" other than the BMW is mooted.  *See United States v. Kahre*, 737 F.3d 554 (9th Cir. 2013) (district court correctly declined to address defendant's claim that evidence was seized unlawfully, because prosecution never introduced the seized evidence, "thereby rendering the motion to suppress moot"); *United States v. Arias-Villanueva,* 998 F.2d 1491, 1502 (9th Cir. 1993) (holding that appeal of denial of a suppression motion is "moot because the government did not introduce any evidence seized during [the] search at trial"); *United States v. Tiem Trinh*, 665 F.3d 1, 17 (1st Cir. 2011) ("the record shows that no evidence concerning the leaf fragment was in fact introduced at trial, making any argument in favor of his motion to suppress . . . now moot").

## II.    The Warrant Described the Items to be Seized with Sufficient Particularity and Was Not Overbroad.

To be valid under the Fourth Amendment, a search warrant must meet the requirements of particularity and breadth.  The Ninth Circuit has defined particularity as "the requirement that the warrant must clearly state what is sought" and breadth as "the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based."  *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009) (quoting *In re Grand Jury Subpoenas Dated Dec. 10, 1987,* 926 F.2d 847, 856–57 (9th Cir.1991)

Particularity means that "the warrant must make clear to the executing officer exactly what it is that he or she is authorized to search for and seize."  *Id.* at 702 (internal citation omitted).  The description must be "specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized."  *United States v. Spilotro,* 800 F.2d 959, 963 (9th Cir.1986)).

"However, the level of detail necessary in a warrant is related to the particular circumstances and the nature of the evidence sought." *Adjani,* 452 F.3d at 1147. Indeed, "[w]arrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible." *Spilotro,* 800 F.2d at 963.

A warrant must not only give clear instructions to a search team, it must also give legal, that is, not overbroad, instructions. Under the Fourth Amendment, this means that "there [must] be probable cause to seize the particular thing[s] named in the warrant." *In re Grand Jury Subpoenas,* 926 F.2d at 857. "The number of files that could be scrutinized ... is not determinative. The search and seizure of large quantities of material is justified if the material is within the scope of the probable cause underlying the warrant." *United States v. Hayes,* 794 F.2d 1348, 1355 (9th Cir. 1986).

In determining whether a warrant's description of the items to be seized meets the Fourth Amendment requirements, the Ninth Circuit has focused on three questions: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued. *Spilotro*, 800 F.2d at 963-64 (internal citations omitted).

### A.     The Electronics Provision was Sufficiently Particular and Not Overbroad.

Defendant argues that the warrant's electronics provision authorizing the seizure of any computers, cell phones, and electronic data storage devices "used in connection with identity theft and counterfeiting" lacked particularity because it provided no guidance to the executing officers on how to determine whether a device was used in connection with identity theft and counterfeiting." Mot. at 11. His argument fails because, based on the three *Spilotro* considerations, the provision was sufficiently specific to pass muster under the Fourth Amendment.

Starting with particularity, the warrant could not have described the computers, cell phones, and other electronic storage devices with greater precision given the early stage of its investigation. The affidavit included Postal Inspector's expert opinions, based on his training and experience, about the common practices of counterfeiters and identity thieves (for example, "counterfeiters will often use

computers or other electronic devices to design counterfeit Money Orders," SW Affidavit ¶ 12(a)). But without knowing what kind of devices were used and how, the warrant could not describe in greater detail the devices to be seized. *See United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997) (warrant authorizing seizure of suspect's entire computer system was valid because, although government knew that suspect had downloaded child pornography, it did not know whether the images were stored on the hard drive or on one of many computer disks); *United States v. Hay*, 231 F.3d 630, 636-38 (9th Cir. 2000) (warrant authorizing search and seizure of suspect's entire computer system and virtually every document in suspect's possession permitted because, although the government knew that 19 child pornography images had been sent to suspect's computer, it had no way of knowing where the images were stored).

Next, the warrant provided the postal inspectors who executed the warrant an objective standard by which to differentiate electronic devices subject to seizure from those which are not. In *Spilotro*, the court found a warrant failed to describe the items to be seized with sufficient particularity where it authorized the "wholesale seizure of entire categories of items not generally evidence of criminal activity," including "address books, notebooks, notes, documents, records, assets, photographs, and other items and paraphernalia" and "the only limit on the search and seizure was the requirement that the items seized be evidence of a violation of any one of thirteen statutes, some of exceptional scope" 800 F.2d at 965. If further stated, in dicta, that "[r]eference to a specific illegal activity can, in appropriate cases, provide substantive guidance for the officer's exercise of discretion in executing the warrant." 800 F.2d 959. For example, Courts have upheld warrants that identified the alleged criminal activities in connection with which the items were sought. *See United States v. Washington,* 782 F.2d 807, 818 (9th Cir.1986) (search limited to items evidencing "involvement and control of prostitution activity" narrow enough to satisfy particularity requirement); *United States v. Hayes*, 794 F.2d 1348, 1356 (seizure limited to records related to distribution of controlled substances); *cf. United States v. Dennis,* 625 F.2d 782, 792–93 (8th Cir.1980) (warrant referring to extortionate credit transactions in addition to listing four federal statutes upheld).

Here, the officers who executed the warrant were limited in their search and seizure to electronic devices (including cell phones and computers and storage devices) that were "used in connection with

1  identity theft and counterfeiting" within a specific three-month period.  Instead of giving the officers

2  broad discretion to seize any electronics that were used to violate several California Penal Code Sections

3  496(a) Possession of Stolen Property, 495 (Burglary), 530.5(a) (Identity Theft), 475(a) (Forgery), and

4  182(a)(1) (Conspiracy), the warrant "more specifically identified the alleged criminal activities in

5  connection with which the items were sought." *See Spilotro*, 800 F.2d at 964.   Accordingly, the

6  warrant's electronics provision more closely resembles the limiting language that the Ninth Circuit

7  approved in *Hayes* (evidence of purchasing, dispensing, and prescribing of controlled substances), 794

8  F.2d at 1356, than the general warrant authorizing the seizure of items "evidencing violations of the

9  multiple statutes listed" that the Court invalidated in *Spilotro*, 800 F.2d at 964.

10         Furthermore, Postal Inspector Singh's affidavit, which was attached to and incorporated by

11  reference in the warrant, gave the executing officers additional guidance to distinguish between

12  electronic devices used in connection with counterfeiting and identity and devices that are legally used.

13  An affidavit may be relied on to provide the requisite particularity in an otherwise overbroad warrant "if

14  (1) the affidavit accompanies the warrant, and (2) the warrant uses suitable words of reference which

15  incorporate the affidavit therein." *Hayes*, 794 F.2d at 1354 (quoting and citing *United State v.*

16  *Hillyard,* 677 F.2d, 1336, 1340 (9th Cir. 1982).   In addition, the "conclusions of the affiant based on

17  experience and investigations may be considered."  *United States v. Crozier,* 777 F.2d 1376, 1380 (9th

18  Cir. 1985).  Here, the executing officers knew from reading Singh's affidavit that "counterfeiters will

19  often use computers or other electronic devices to design counterfeit Money Orders," SW Affidavit ¶

20  12(a), and that "it is common for individuals involved in…access device fraud and identity theft to use

21  and maintain electronic devices."  *Id.* ¶ 12(d).  The affidavit also contained detailed information about

22  *how* individuals involved in access device fraud and identity theft use these devices in furtherance of

23  these criminal activities:

24         These individuals use such devices to store information about their fraud
           and identity theft crimes…includ[ing] logs of fraudulent transaction
25         history, records of funds seized, information regarding individuals and
           companies that have been victimized, records of payments from co-
26         conspirator, and victim profiles.  Such "profiles" contain the personal
           identifying information of victims, such as names, Social Security
27         numbers, dates of birth, driver's license or state identification numbers,

28

1

2

alien registration number, passport numbers, and employer or taxpayer
identification numbers.

3

SW Affidavit ¶ 12(d). Where, as here, the attached and incorporated affidavit to a search warrant

4

describes indicia or identifiable markers that "reasonably guide[d] the officers in avoiding the seizure of

5

protected property, a search warrant authorizing such seizure is not a general warrant." *Hayes*, 794 F.2d

6

at 1356.

7

*United States v. Holzman* does not further Defendant's argument. In that case, the Ninth Circuit

8

rejected a search warrant authorizing the search for "any property or devices used or obtained through

9

fraud operations." 871 F.2d at 1509. This description failed the particularity requirement because it did

10

not "limit the search to items readily identifiable with a particular transaction," it did not provide "any

11

other objective guidelines to limit the scope of the officers' discretion," and *"the necessary limitation*

12

*similarly cannot be divined from the language of the preceding lines of the warrant*." *Id.* at 1509-10

13

(emphasis added). Whereas Postal Inspector Singh's affidavit provided the necessary limiting language

14

that allowed the executing officers to identify and seize only those electronic devices that were used "in

15

connection with identity theft and counterfeiting," there was no such language in the *Holzman* warrant

16

or any attached and incorporated affidavit to limit the officers' discretion in determining whether a

17

property or device was obtained through a fraud operation.

18

Defendant's overbreadth challenge to the electronics provision also falls flat. It cannot rely on

19

*United States v. Lacy* and *United States v. Hay*, because in those cases, the Ninth Circuit upheld a

20

warrant that had equally, if not more expansive, language to describe the electronic devices to be seized.

21

In *Lacy*, the warrant authorized the seizure of "computer equipment and records" as well as "documents

22

relating to BAMSE" was not overly broad because the affidavit established probable cause to believe

23

that Lacy's "entire computer was likely to evidence criminal activity" and "there was no way to specify

24

what hardware and software had to be seized to retrieve the images accurately." 119 F.3d 742, 746-47

25

(9th Cir. 1997). Likewise, the court in *Hay* approved a warrant that authorized the seizure of computer

26

hardware, computer software, records stored in the form of electronic or magnetic coding or on

27

computer media, records "involved with child pornography" even though the computer and electronic

28

storage provisions did not specifically mention child pornography because the preface "limit[ed] the

1   scope of the search to materials which constitute evidence of the commission of…violations of [child

2   sexual exploitation statutes]." 231 F.3d 630, 637 (9th Cir. 2000).  Furthermore, a more specific

3   description of the computer equipment was not possible because the government had no way of knowing

4   where the child pornography images were stored.  *Id.*

5        The same analysis applies in this case.  As already explained, Postal Inspector Singh's affidavit

6   established probable cause that evidence of counterfeiting/forgery would be found on cell phones,

7   computers, and electronic devices located at the apartment.  The wording of the electronics provision in

8   Attachment B limited the scope of the seizure to only those devices that were used in connection with

9   specific criminal activities.  Because law enforcement had no way of knowing in advance of the search

10  where exactly the evidence would be located among the electronic devices, the scope of the seizure had

11  to include "internal or external hard drives, removable hard drives, removable storage devices…compact

12  disks…media players with storage capabilities…" and "all user created files, including but not limited to

13  audio, video, voicemail…"  SW Attachment B, Items 11 and 12.  *See Adjani*, 452 F.3d at 1149-50 ("the

14  warrant arguably might have provided for a less invasive search of Adjani's [email] 'inbox' and 'outbox'

15  … as opposed to the wholesale search of the contents of all emails …[but] [a]voiding that kind of

16  specificity and limitation was not unreasonable … To require such a pinpointed computer search,

17  restricting the search to an email program or to specific search terms, would likely have failed to cast a

18  sufficiently wide net to capture the evidence sought").

19        **B.       The Counterfeit Money Orders Provision was Sufficiently Particular.**

20        Defendant's complaint that the warrant failed to define the terms "counterfeit" money orders and

21  "Postal money order stock" are meritless.  If store managers and ordinary citizens can identify

22  counterfeit bills, *see Carney*, 675 F.3d at 1008, store clerks can identify counterfeit Western Union

23  money orders, *Duegaw*, 150 Fed. Appx at 803-04, and bank loss investigators can identify counterfeit

24  postal money orders, SW Attachment ¶ 6, it stands to reason that postal inspectors executing the search

25  warrant could differentiate between counterfeit postal money orders and genuine postal money orders.

26  The affidavit did not include instructions on how to identify "counterfeit" money orders and money

27  order stock because they were unnecessary, and the absence of those instructions does not render the

28  warrant insufficiently particular.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**III.    Suppression is Unwarranted Because the Government's Search Was Conducted in Good Faith.**

Even if the Court holds that there was a Fourth Amendment violation in this case, suppression is not warranted because Postal Inspector Singh relied on a validly issued search warrant in good faith.  As the Supreme Court found in *Leon*, the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion. 468 U.S. 897, 922 (1984).  Unless a "reasonably well trained officer would have known that the search was illegal in light of all of the circumstances," the fruits of an illegal search should not be suppressed.  *Herring v. United States*, 555 U.S. 135, 145 (2009) (*quoting Leon*, 468 U.S. at 922 n.23) (internal quotation marks omitted).  It "is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.  In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient," *Leon*, 468 U.S. at 921, and "suppression of evidence is not an appropriate remedy where an officer executes a warrant he reasonably believed to be valid." *United States v. Meek*, 366 F.3d 705, 714 (9th Cir. 2004) (citing *Illinois v. Krull*, 480 U.S. 340, 349–50 (1987)).

The Court in *Leon* identified four situations that *per se* fail to satisfy the good faith exception. *468* U.S. at 922-23.  None of those are situations apply here.  First, Postal Inspector Singh did not mislead the California Superior Court judge who issued the warrant, the Honorable Tim Kam, by making a false statement or recklessly disregarding the truth in making a statement.  Defendant makes no allegation of such misconduct.  Second, there is no claim, let alone evidence to suggest, that Judge Kam wholly abandoned his judicial role in approving the warrant, acting only as a "rubber stamp" to the warrant application rather than as a neutral and detached official.

Third, the warrant was not so "facially deficient" in detail as to the place to be searched or the things to be found that the officers could not reasonably presume it to be valid.  *Leon*, 468 at 923.   As argued above, the warrant limited the officers' exercise of discretion even when it authorized the search and seizure of the broadest categories of items, such as the "any vehicles" provision and the electronic

1   devices provision, by reference to specific illegal activities (counterfeiting and identity theft) and three-

2   month time period.  *Compare United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) (officers could not

3   reasonably have relied on a warrant that authorized seizure of essentially all of corporation's business

4   documents and records and none of the categories of seizable documents was limited by reference to any

5   alleged criminal activity).

6       Fourth, the affidavit upon which the warrant was based was not so "bare bones" or "lacking in

7   indicia of probable cause" that no reasonable officer could rely upon it in good faith.  *Leon*, 468 F.3d at

8   923, 926.   In *Underwood*, the only information provided to suggest that drug trafficking evidence would

9   be found at Underwood's home was that law enforcement had observed "a baggie of a personal-use

10  amount of marijuana" in his home and observed him deliver two wooden crates on one occasion three

11  months before the warrant application.  725 F.3d at 1082–83.  There is a stark difference between such

12  bare factual assertions and the detailed information that Postal Inspector Singh provided in his affidavit.

13      Finally, suppression is an unfairly harsh remedy in a scenario where government agents did

14  nothing wrong.  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that

15  exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid

16  by the justice system."  *Herring,* 555 U.S. at 144.   Postal Inspector Singh's affidavit reflected diligent

17  investigation, including conversations with bank loss investigators, surveillance, and research.  Even if

18  the Court ultimately agrees with some of the Defendant's objections, not one of them is glaring or overt,

19  or suggests anything approaching misconduct.  Suppression of this evidence, therefore, would not

20  "meaningfully deter" agents engaged in similar investigations.

21                              **CONCLUSION**

22      For the reasons set forth above, the United States respectfully requests that the Court deny

23  Defendant's motion in its entirety.

24  DATED:        December 8, 2021                    Respectfully submitted,

25
                                                     STEPHANIE M. HINDS
26                                                   Acting United States Attorney

27                                                      */s/ Yoosun Koh*
28                                                   YOOSUN KOH
                                                     Assistant United States Attorney

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28