GEOFFREY HANSEN
Acting Federal Public Defender
Northern District of California
SOPHIA WHITING
CARMEN SMARANDOIU
Assistant Federal Public Defenders
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:       Sophia_Whiting@fd.org


Counsel for Defendant POWELL JR.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BENNIE POWELL JR.,<br><br>Defendant. | **Case No.:** CR 21–00070 RS<br><br>**DEFENDANT BENNIE POWELL JR.'S REPLY IN SUPPORT OF MOTION TO SUPPRESS** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ..........................................................................................................i

**TABLE OF AUTHORITIES** .............................................................................................i

INTRODUCTION ...............................................................................................................1

ARGUMENT.......................................................................................................................1

    I.     The search warrant is devoid of probable cause of the alleged offenses ........................1

          A.     The Court may only look at the four corners of the search warrant affidavit, not extraneous information provided by the government ...........................................1

          B.     Government does not substantively argue probable cause for conspiracy and identity theft, and concedes mail theft ..................................................................3

          C.     The government's motion underscores that "counterfeit money orders" is a conclusory statement that cannot provide probable cause for the alleged crimes 4

               1.     The government's own examples of counterfeiting show the affidavit lacks sufficient facts........................................................................................4

               2.     The government's cited cases are not analogous .......................................5

               3.     "Underlying facts" provided by the government are benign or conclusory ....................................................................................................................8

          D.     No probable cause to search the residence due to lack of nexus between the single transaction and the place to be searched ....................................................9

    II.    The search warrant is insufficiently particular and fatally overbroad. ..........................10

          A.     The government has disclaimed reliance on any evidence obtained from the Infiniti .............................................................................................................10

           B.     The electronics provisions is insufficiently particular and overbroad ...............11

                1.     Lack of nexus between the criminal activity alleged and the electronic devices.....................................................................................................11

                2.     Lack of particularity.............................................................................13

           C.     The provision allowing the seizure of "counterfeit money orders or Postal money order stock" is insufficiently particular.................................................15

    III.    The good faith exception does not save the warrant.......................................................16

          A.     The warrant is utterly lacking in indicia of probable cause of criminal activity 16

          B.     The warrant is utterly lacking in indicia of probable cause that evidence of the alleged crimes would be found on electronic devices .......................................18

CONCLUSION.................................................................................................................20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Federal Cases**

*Greenstreet v. Cty. of San Bernardino*,
41 F.3d 1306 (9th Cir. 1994) ............................................................... 10, 16

*Marron v. United States*,
275 U.S. 192 (1927) ........................................................................... 13

*Matter of Prop. Belonging to Talk of the Town Bookstore, Inc.*,
644 F.2d 1317 (9th Cir. 1981) ............................................................ 14

*United States v. Carney*,
675 F.3d 1007 (6th Cir. 2012) ................................................. 5, 8, 15, 19

*United States v. Cervantes*,
703 F.3d 1135 (9th Cir. 2012) .............................................................. 7

*United States v. Ciammitti*,
720 F.2d 927 (6th Cir. 1983) ............................................................... 4

*United States v. Clark*,
31 F.3d 831 (9th Cir. 1994) ................................................................ 7

*United States v. Duegaw*,
2005 WL 6005166 at *3 (10th Cir. 2005) ................................................ 6

*United States v. Finch*,
998 F.2d 349 (6th Cir. 1993) ............................................................... 4

*United States v. Gourde*,
440 F.3d 1065 (9th Cir. 2006) (en banc) .................................................. 1

*United States v. Hay*,
231 F.3d 630 (9th Cir. 2000) ............................................................... 12

*United States v. Holzman*,
871 F.2d 1496 (9th Cir. 1989) .......................................................... 14, 17

*United States v. Hove*,
848 F.2d 137 (9th Cir.1988) ........................................................... 15, 16

*United States v. Lacy*,
119 F.3d 742 (9th Cir. 1997) .............................................................. 12

*United States v. Leon*,
468 U.S. 897 (1984) .................................................................... 15, 19

*United States v. Luong*,
470 F.3d 898 (9th Cir. 2006) ......................................................... 16, 17

*United States v. McGrew*,
  122 F.3d 847 (9th Cir. 1997) ........................................................................... 13

*United States v. McPhearson*,
  469 F.3d 518 (6th Cir. 2006) ................................................................. 5, 8, 19

*United States v. Ramos*,
  923 F.2d 1346 (9th Cir.1991) .......................................................................... 16

*United States v. Schesso*,
  730 F.3d 1040 (9th Cir. 2013) ........................................................................ 17

*United States v. Strand*,
  761 F.2d 449–54 (8th Cir. 1985) ............................................................... 13-14

*United States v. Underwood*,
  725 F.3d 1076 (9th Cir. 2013) ................................................................. *passim*

*United States v. Weber*,
  923 F.2d 1338 (9th Cir. 1990) ............................................................. 3, 10, 16

**INTRODUCTION**

The government's arguments addressing probable cause, particularity, and overbreadth are unavailing. The good faith exception cannot save the "bare bones" search warrant affidavit. The Court should therefore grant Mr. Powell's motion and suppress all evidence derived from the November 21, 2019 search warrant.[1]

**ARGUMENT**

**I.    The search warrant is devoid of probable cause of the alleged offenses**

**A.    The Court may only look at the four corners of the search warrant affidavit, not extraneous information provided by the government**

All information necessary to show probable cause "must be contained within the four corners of a written affidavit given under oath." *United States v. Gourde*, 440 F.3d 1065, 1067 (9th Cir. 2006) (en banc) (quotation and citation omitted). In its opposition, the government has described and implied information not found in the written affidavit, which cannot be considered in the probable cause analysis.

First, the government repeatedly describes two transactions involving "counterfeit" postal money orders. *See* Dkt. 88, United States' Opposition to Defendant's Motion to Suppress ("Opp.") at 9 ("Postal Inspector Singh's affidavit in support of the search warrant described two separate transactions involving counterfeit postal money orders that occurred within several days of each other, at two different Westamerica Bank branches."); *id.* at 6 ("[Sherman] determined that the same person tried to pass the counterfeit money orders on both occasions."). To be clear, the search warrant affidavit describes only **one** transaction involving "counterfeit" postal money orders. SW ¶ 6 (involving five money orders "negotiated" at Westamerica Bank Vallejo Branch on November 14, 2019). The affidavit alleges that, on a later date, the "same subject" "tried to cash three (3) additional Money Orders" at a different Westamerica bank." SW ¶ 8. This second incident is *not* described as involving "counterfeit" or "not valid" postal money orders. *See id.*

---

[1] After the defendant's motion to suppress was filed, the government provided previously undisclosed discovery of a federal search warrant for two cell phones recovered during the execution of the state search warrant. The cell phones and their contents are a clear fruit of the November 21, 2019, search warrant as this is how the cell phones were identified, seized, and searched.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Second, the government repeatedly states that Cory "sent the serial numbers of the five money orders to the Verification Unit." Opp. at 2; *see also id*. at 5 ("[Cory] called the U.S. Postal Service Money Order Verification unit, gave the serial numbers of the five suspicious counterfeit money orders"); *id*. at 7 ("the U.S. Postal Service checked these serial numbers and confirmed that the money orders were not valid."); *id*. at 9 ("called the USPS Money Order Verification Unit and provided serial numbers"); *id*. at 10 ("inspected [the five counterfeit money orders], gave their serial numbers to the U.S. Postal Service Money Order Verification Unit"). The affidavit does not describe Cory inspecting the money orders nor giving the serial numbers to the Verification Unit. The affidavit says Cory "sent" the serial numbers without explaining who she sent them to, though the context indicates she sent them to Inspector Sherman, not the Verification Unit. SW ¶ 7. The communication between Cory and the Verification Unit was by phone (which made *sending* serial numbers impossible) whereas the paragraph at issue describes an email Cory sent to Inspector Sherman.[2] *Id*. Logically, then, Cory "sent" the numbers to Sherman. The affidavit does not state that Cory "gave" or "provided" the serial numbers to the Verification Unit, nor that the Verification Unit checked the serial numbers. *See id*. The affidavit provides no information about why Cory was told they were "not valid." *See id*.

Third, the government provides Cory's job responsibilities in its opposition, but this description is not provided in the affidavit. Opp. at 10 ("To the contrary, as a loss investigator for Westamerica Bank, it was her job to investigate suspicious activities and transactions that caused financial loss to the bank and truthfully report fraudulent transactions to law enforcement.").

The Court may not consider this extraneous information, nor the government's other glosses on the warrant,[3] in deciding the motion.

---

[2] Though not relevant to the probable cause determination, this natural reading is consistent with the discovery, which includes the email from Cory to Sherman with the serial numbers.

[3] For example, the government also states the property manager at 1 Spyglass Parkway "positively identified the individual shown in one of the bank images as an individual, Timothy Sears, who lived in the complex." Opp. at 3. The affidavit states that the property manager confirmed the man in the image "lived in the complex," but does not state that she identified him by name. SW ¶ 10.

### B. The government does not substantively argue probable cause for conspiracy and identity theft, and concedes mail theft

The government argues that the affidavit in support of search warrant provided probable cause of forgery and possession of stolen property. Opp. at 4. While the government "maintains that the affidavit also supplied probable cause for identity theft and conspiracy," it does not present a substantive argument for either. *Id*. The government has therefore waived reliance on these arguments.

As for mail theft, the government claims in a footnote that Postal Inspector Singh makes no claim that "there is probable cause that the crime of mail theft has been committed or that evidence of mail theft may be found in the location to be searched." Opp. at 7 n.2. Yet Singh repeatedly references mail theft as the basis for the search warrant. It is included in the very title of his "Training and Experience" section and used throughout in an effort to bolster his relevant experience, the basis for the search warrant, and probable cause to search the locations to be searched. SW ¶ 12. While Mr. Powell appreciates the government's well-taken concession that the affidavit does not support probable cause of mail theft, Singh's repeated reliance on it highlights the multiple deficiencies in this warrant, including his reliance on "rambling boilerplate recitations designed to meet all law enforcement needs" and that "the 'expert' portion of the affidavit was not drafted with the facts of this case or this particular defendant in mind." *United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990).

Based on these apparent concessions that there is no probable cause to suspect the man of identity theft, conspiracy, and mail theft, the "Training and Experience Regarding Mail and Identity Theft" section should be excised from the affidavit. *See* SW ¶ 12; *see also Weber*, 923 F.2d 1338 ( "if the government presents expert opinion about the behavior of a particular class of persons, for the opinion to have any relevance, the affidavit must lay a foundation which shows that the person subject to the search is a member of the class."). At minimum, paragraphs 12(c)-(f) should be excised as foundationless and irrelevant. *See id*.

**C.    The government's motion underscores that "counterfeit money orders" is a conclusory statement that cannot provide probable cause for the alleged crimes**

The fact that the government continues to argue that the search warrant affidavit provides probable cause for both forgery *and* possession of stolen property underscores the lack of sufficient facts underlying the conclusory term "counterfeit" or "not valid" money orders, therefore, the lack of probable cause for either offense. The cases and additional "underlying facts" cited by the government do not address, nonetheless overcome, this fatality.

**1.    The government's own examples of counterfeiting show the affidavit lacks sufficient facts**

The government speculates in its opposition that the facts presented in the affidavit lead to the "natural and reasonable inference" that one of many things could have occurred that would cause a money order to be considered "counterfeit": (1) a "counterfeiter" designed and printed money orders with made up serial numbers; (2) the money orders were genuine U.S. Postal Service-issued money orders bearing real serial numbers that were stolen from the U.S. Postal Service . . . and someone forged the payment information on the orders before cashing them; or (3) the money orders were genuine U.S. Postal Service-issued money orders bearing real serial numbers that were stolen from the legitimate purchaser or recipient . . . and someone forged the payment information on the orders before cashing them. Opp. at 7. If the latter, the money orders would have been purchased at a post office, where "the USPS clerk prints the date of purchase, post office code, a number identifying the clerk, and amount of the purchase on the money order," then "the customer fills in the name and address information for the sender and payee." *Cf.* Dkt. 1, Complaint ¶ 18. Thus, if a genuine money order is stolen from a legitimate purchaser or recipient, it could be cashed by someone under their real name, if the payee name was initially left blank and the person wrote in their own name, or it could be cashed under a false identity. A money order would also be "counterfeit" if 4) the intended payee would alter the dollar amount on a genuine money order, which could be done by hand, using a typewriter, or a computer printer. [4]

---

[4] As Mr. Powell has explained, Singh provided no such background information regarding money orders in his affidavit, therefore depriving the state judge of the ability to adequately assess probable cause.

Whether the money orders were "counterfeit" due to having "made up serial numbers," having "forged" payment information on stolen money orders, having "forged" information on non-stolen money orders, or some other reason are precisely the types of facts that must be provided to the magistrate judge to demonstrate probable cause of a crime and a fair probability that evidence will be found at the location to be searched. Without any such facts, there is no probable cause for either offense, since the affidavit asserts the bare conclusion that the money orders were "counterfeit" and/or "not valid" without explaining what made them so. This information should be known and available to the affiant if any investigation in fact took place. Were the serial numbers genuine or not? Were they genuine but reported stolen? Was there something else suspicious about the money orders – for example the watermark, security thread, or discoloration around the dollar amounts? Did the teller suspect the person cashing the check was not in fact Timothy Sears? Did the money order contain false payment information, i.e. a false payor or payee? Was the forged information printed or handwritten?[5] The lack of information is precisely why the magistrate judge did not have the facts necessary to make a probable cause determination regarding either alleged crime.

Furthermore, because the affidavit did not contain underlying facts describing *why* the money order was suspicious, the conclusion that the man is a "counterfeiter" based on one transaction involving "counterfeit" money orders

## 2.     The government's cited cases are not analogous

The out-of-circuit cases cited by the government do not cure this issue because (1) they involve many more facts adding to the "totality of the circumstances;" (2) they largely involve "counterfeit money;" and (3) the issue of "conclusory statements" is never raised. The Sixth Circuit has a different standard for determining whether an affidavit is conclusory in nature. It has "defined a conclusory affidavit as one which states 'only the affiant's belief that probable cause existed.'" *United States v. Finch*, 998 F.2d 349, 352 (6th Cir. 1993) (citing *United States v. Ciammitti*, 720 F.2d 927, 932 (6th Cir. 1983), cert. denied, 466 U.S. 970 (1984)). In the Ninth Circuit, "[c]onclusions of the affiant unsupported by underlying facts cannot be used to establish probable cause. … An affidavit must

---

[5] The payor and payee information is often handwritten.

recite underlying facts so that the issuing judge can draw his or her own reasonable inferences and conclusions; it is these facts that form the central basis of the probable cause determination." *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013). These cases would be subject to a different analysis under *Underwood*.

Regardless, the facts of the cited out-of-district cases are distinguishable. The Court in *United States v. Carney* specifically distinguishes a case, like here, "where someone was caught one time passing a counterfeit bill . . . because it might not be particularly likely that evidence would be at the person's home." 675 F.3d 1007, 1013 (6th Cir. 2012) (*citing United States v. McPhearson*, 469 F.3d 518 (6th Cir. 2006) (holding lack of probable cause to issue warrant because insufficient nexus between defendant's single possession of drugs outside of his home and evidence of wrongdoing at his home.). Unlike the instant case, which involved one transaction involving "counterfeit" money orders, *Carney* involved (1) *two* separate counterfeit transactions; (2) both involving counterfeit *money*; and (3) different denominations of counterfeit money. *See id* at 1012. The affidavit also extensively tied both the man (who was identified as part of a photo lineup) and the car (identified by description and license plate number) to the residence to be searched, by tracing the car to the residence through observations and registration records, surveillance footage, probation and state court records, the officers knocked on the door and the defendant answered the door, and the man was arrested on counterfeiting charges, all before the warrant issued. *Id*. Though these differences provide more than sufficient distinction, the defendant also did not raise, nor did the Court address, whether "counterfeit money" was conclusory. The issue may have been raised and subject to a different analysis under the *Underwood* standard in the Ninth Circuit. While that issue was not litigated, it is also a different question from "counterfeit money orders" which can be suspected counterfeit for a number of reasons distinct from banknotes. *See* Opp. at 7 (listing the ways in which a money order may be deemed "counterfeit"). While genuine or stolen banknotes would not be considered counterfeit, the same cannot be said of money orders, because otherwise genuine money orders can be altered by printing press, printer, typewriter, and even hand to reflect a different payment amount, sender, or payee. Counterfeiting banknotes, on the other hand, require

counterfeiting equipment. Unlike banknotes, money orders may also be cashed using a false identity. A retailer is also unlikely to misidentify a banknote as counterfeit, because a banknote is not genuine if identified as counterfeit by a detector pen or black light.

In unpublished *United States v. Duegaw*, the Tenth Circuit found probable cause sufficient to search a car—not residence—which officers explained actually contained evidence consistent with counterfeiting, following Duegaw's arrest. 150 F. App'x 803 (10th Cir. 2005). As described in the search warrant affidavit, police officers arrived at the scene to investigate a suspected counterfeit money order transaction by Charity Kossin using the false name Chrissy Kelly. *Id*. at 804. During questioning of Kossin's associate Duegaw, Duegaw "gave officers a false name and provided identification which listed two different dates of birth and did not match the name he gave to police." *Id*. He also "stated that there was a computer and combination printer, fax, copier, and scanner" in the car. *Id*. He originally told the police the equipment was for his college course work, but then admitted he lied about attending college. *Id*. The affidavit therefore specifically "also drew a connection between the suspected criminal activity and the place to be searched." *Id*. at 805. The Court highlighted all of these factual details in the affidavit to find "based on the totality of the circumstances" the magistrate judge had sufficient basis for drawing a reasonable inference that a search of the Jeep (not either suspect's residence) would uncover evidence of counterfeiting. *Id*. at 806. The only similarity between Duegaw and the instant case is the transaction involving a counterfeit money order, which only *initiated* the officer's investigation in *Duegaw*. This initial tip was followed by many more pertinent factors provided by Duegaw and the officer's observations establishing probable cause that evidence would be found in the car (a car which inexplicably contained a computer, combination printer, fax, copier, *and* scanner, about which the defendant lied). Furthermore, while not at issue before the Court because the term "counterfeit money order" was not litigated, the affidavit did include additional facts baring on the legitimacy of the money order— including that Duegaw identified his associate as Charity Kcassing, but she tried to cash the money order as Chrissy Kelly. *See United States v. Duegaw*, 2005 WL 6005166 at *3 (10th Cir. 2005) (Appellate Brief).

POWELL MTN. TO SUPPRESS REPLY
*POWELL JR.*, CR 21–00070 RS

Unpublished *Rice v. United States*, involved admittedly counterfeit *money* and a direct connection between the place to be searched and the suspected criminal activity. 134 F. App'x 839 at 841. Investigators followed up on the tip from a gas station of counterfeit money, conducted an interview of the person who attempted to use the money, she wrote a statement, and police obtained specific details from her about where and when she obtained the counterfeit money. *Id.* at 839-840. She described the residence to be searched, the same residence where she had been given the counterfeit money just a few hours beforehand. *Id.* Furthermore, the issue of "counterfeit money" being a conclusory statement was not litigated and the tip only initiated the subsequent investigation.

### 3.    "Underlying facts" provided by the government are benign or conclusory

Many of the details emphasized by the government to support probable cause are innocent details that do not add to the totality of the circumstances or are not contained within the affidavit. *See* Opp. at 9; *see also United States v. Cervantes*, 703 F.3d 1135, 1140 (9th Cir. 2012) ("Much of the activity described by Hankel is consistent with perfectly innocent behavior."). First, that the individual attempted to cash additional money orders a few days later does not add to probable cause because the affidavit does not assert that this attempted transaction was in any way illegitimate. *See* SW ¶ 8. Nor does it bare on probable cause that the images emailed to Sherman "appear[] to be the same subsect." *Id.*; s*ee United States v. Clark*, 31 F.3d 831, 834 (9th Cir. 1994) ("Mere confirmation of innocent static details in an anonymous tip does not constitute corroboration."). The affidavit does not explain why this second attempt was unsuccessful. One benign explanation is that Timothy Sears was red-flagged by Westamerica Bank after the first transaction. Second, as previous explained, *see supra* Part I.A., the affidavit does not say that Cory provided serial numbers to the Verification Unit nor how they determined the validity of the money orders. The Court was provided no information about what Cory or the Verification Unit does, the process for determining validity, or the qualification for these positions to rely on their conclusions as opposed to facts provided by them. The issue is not their motive, rather, the lack of facts about them or the validation process to substantiate their conclusory statements. The government cannot cure this issue by adding information not found in the affidavit. *See* Opp. at 10 ("it was her job to investigate suspicious

activities and transactions that caused financial loss to the bank and truthfully report fraudulent transactions to law enforcement"). Third, that Sherman "received copies of the suspicious money orders" and surveillance footage is irrelevant without more (e.g. a description of independent investigation confirming illegality). Opp. at 9. The pertinent statements remaining are the bare assertions that: (1) "an individual had cashed five counterfeit postal money orders" and (2) according to Cory, "the USPS Money Order Verification Unit" said they were "not valid." *See* Opp. at 8.

### D. No probable cause to search the residence due to lack of nexus between the single transaction and the place to be searched

The government argues in its opposition that the affidavit established probable cause to search the residence at 1001 Spyglass Parkway. Yet the government's own seminal case underscores why probable cause is deficient to search the home. *See Carney*, 675 F.3d 1007. The government again relies on a fact absent from the affidavit, it claims "a magistrate judge could reasonably infer that someone who passes counterfeit postal money orders at *banks* would have evidence of his criminal activities . . . at his home, on his person, or in the cars that he drove to and from the *banks* where he cashed counterfeit money orders." Opp. at 12. Yet there is only **one** bank involving **one** "counterfeit" transaction at issue so, as the Court pointed out in *Carney*, evidence is not be likely to be found at a person's home where that person was caught just one time in a counterfeit transaction. 675 F.3d at 1013 (citing *McPhearson*, 469 F.3d 518 (holding lack of probable cause to issue warrant because insufficient nexus between defendant's single possession of drugs and a search of his home). Even the affidavit asserts the option that this could be an instance of a "mule[] or innocent subject" cashing money orders provided to them by a counterfeiter. SW ¶ 12(a) ("Good counterfeiters will print or produce large quantities of Money Orders and have or mules innocent subjects cash them at financial institutions."). In that case, neither evidence of counterfeiting nor stolen property would be found at the residence.

The Ninth Circuit addressed the same issue *Underwood*. 725 F.3d 1076. Though the affidavit alleged Underwood was a drug courier on one occasion, "the expert opinion about drug traffickers keeping evidence of their crimes at their homes is foundationless because the affidavit did not assert that Underwood was a drug trafficker, and thus cannot be used to support probable cause." *Id.* at

1086. Here, too, the probable cause statement alleges that the man cashed "counterfeit" money orders on one occasion, it does not assert that the man is *a counterfeiter*, but the expertise section provides foundationless opinions about "counterfeiters." SW ¶ 12. Even assuming Underwood trafficked drugs on the date at issue, the Court emphasized "Underwood delivered those crates to Luong and Barrera, who took them away from him." [6] *Id.* Here, too, "it would be unreasonable to conclude" that the man possessed any other "counterfeit" money orders, "let alone" that such money orders would be at his house. *See id.*

The government's common sense argument fairs no better, as it only highlights the inferential leaps required beyond the four corners of the affidavit to understand the alleged criminal conduct. *See* Opp. at 12-13 ("*[i]f* 'Timothy Sears' designed and printed the counterfeit money orders himself . . . *If* 'Timothy Sears' altered payment information on genuine money orders" he would keep the counterfeiting equipment *or* stolen property at his home (emphases added)). It again highlights that the affidavit provides no information about the illegality of the money orders—whether they bore genuine serial numbers, were stolen, altered, or created from whole cloth. Since there are no facts about the money orders, there are also not sufficient facts to support the finding that evidence would be at the home. For example, facts that would bear on the man's knowledge or support a finding that this was more than a one-off occurrence.

## II.    The search warrant is insufficiently particular and fatally overbroad.

### A.    The government has disclaimed reliance on any evidence obtained from the Infiniti

Mr. Powell also challenged, on specificity grounds, several provisions in the search warrant, including the "any vehicles" provision. *See* Defendant Bennie Powell Jr.'s Motion to Suppress (Mot.) at 9-11. In its opposition, the government states that "it has decided not to use the evidence seized from the Infiniti SUV if this case proceeds to trial" and, consequently, that Mr. Powell's argument "with respect to evidence seized from 'any vehicle' other than the BMW is mooted." Opp. at 14. In light of the government's representation and Mr. Powell's concession that, if probable cause of

---

[6] During a protective sweep, an officer also observed a bag of marijuana at Underwood's home. *Id.* at 1082.

criminal activity existed, it was limited to the BMW, Mot. at 9-10, Mr. Powell will not respond to the

government's arguments in this regard. Opp. at 11-14. Nonetheless, he reserves the right to re-raise

the issue if the government changes its position and attempts to rely, directly or indirectly, on any of

the evidence seized from the Infiniti SUV.

**B.     The electronics provisions is insufficiently particular and overbroad**

Mr. Powell also challenges, on specificity grounds, the warrant's provisions authorizing the

seizure and search of all files and all data for a period of three months on all electronic devices from

the residence "used in connection with identity theft and counterfeiting." Mot. at 11-14 (challenging

SW Attach. A ¶ 5, Attach. B ¶¶ 11, 12). The government's arguments in opposition are unavailing.

**1.     Lack of nexus between the criminal activity alleged and the electronic devices**

It is black letter law that a search warrant "must be no broader than the probable cause on

which it is based." *Weber*, 923 F.2d at 1342; *see also SDI Future Health, Inc.*, 568 F.3d at 702

("Breadth deals with the requirement that the scope of the warrant be limited by the probable cause

on which the warrant is based.") (internal quotations omitted). Therefore, "[a] search warrant

designating more than one person or place to be searched must contain sufficient probable cause to

justify its issuance as to each person or place named therein." *Greenstreet v. Cty. of San Bernardino*,

41 F.3d 1306, 1309 (9th Cir. 1994). As Mr. Powell has argued, the search warrant here failed to

provide any factual foundation that the man's alleged offenses had *any* nexus to electronic devices,

rendering the electronics provision unsupported by probable cause and the search warrant overbroad.

Mot. at 12-14.

The government does not meaningfully address Mr. Powell's argument. It claims that "[a]s

already explained, Postal Inspector Singh's affidavit established probable cause that evidence of

counterfeiting/forgery would be found on cell phones, computers, and electronic devices located at

the apartment." Opp. at 19. But nowhere does the government actually address the issue of nexus to

electronics. Instead, in addressing Mr. Powell's *particularity* challenge, the government points out

Singh's boilerplate assertions, in the section titled "Training and Experience Regarding Mail and

Identity Theft," that "counterfeiters will often use computers or other electronic devices to design

counterfeit Money Orders," SW ¶ 12(a), and that "it is common for individuals involved in mail theft, access device fraud, and identity theft to use and maintain electronic devices," *id*. ¶ 12(d), which are allegedly used "to store information about their fraud and identity theft crimes long after the crimes have been committed." *Id*.

Mr. Powell has already explained why these boilerplate assertions cannot support a finding of nexus to electronics, and he will not repeat them here. *See* Mot. at 12-14. However, he would like to emphasize that:

- As noted, the government concedes that Singh's affidavit does not establish probable cause of mail theft, Opp. at 7 n.2, and makes no effort to defend his claims regarding identity theft and conspiracy, which are wholly unsupported by the factual assertions in the affidavit. *See* Opp. at 4; Mot. at 7-8. As such, the government cannot rely on Singh's boilerplate recitations regarding these alleged offenses, SW ¶ 12(c)-(f), to support the nexus requirement for electronics.

- Singh's boilerplate recitation regarding "counterfeiters" is also patently insufficient because the affidavit's conclusory assertions that the money orders were "counterfeit" or "not valid" –without any *underlying facts* regarding in what way they so qualified and how did Cory or the Verification Unit reached their conclusions – cannot support a reasonable inference that the five money orders were "designed" using "computers or other electronic devices, then printed using a "printing press operation" or " a modern color copier[] and computer printer[]." SW ¶ 12(a). *See* Mot. at 12-14. He also uses just one allegedly counterfeit transaction to improperly draw the conclusion that the man is a "counterfeiter." *See supra* Part I.D.

Indeed, the government itself speculates in its opposition about various ways in which the five money orders could have been "counterfeit." *See supra* Part I.C.; opp. at 7. Without a factual description of the alleged "counterfeit" or "not valid" nature of the five money orders, it is pure speculation that they were "designed" using "computers or other electronic devices," then printed using a "printing press operation" or "modern color copiers and computer printers," SW ¶ 12(a) – as opposed to, for instance, genuine money orders stolen and the payee information filled out (which the government advances as a possibility) or genuine money orders where the dollar amount was altered

1   using mechanical means. Furthermore, without a factual basis, there is no support for the seizure of

2   *all electronics* in the residence, including cell phones, regardless of whether they could be used or not

3   in "designing" or "printing" money orders, and for search of *all* files and data on those electronics,

4   regardless of whether evidence regarding "designing" or "printing" money orders would be found

5   there or not.

6   The government's only answer to Mr. Powell's overbreadth challenge is to point out that, in

7   *United States v. Lacy*, 119 F.3d 742 (9th Cir. 1997) and *United States v. Hay*, 231 F.3d 630 (9th Cir.

8   2000), the Ninth Circuit upheld warrants that had "equally, if not more expansive, language to

9   describe the electronic devices to be seized." Opp. at 18-19. The government misses the point. In

10  both those cases, the warrants included specific factual allegations that supported probable cause that

11  computers were used in the commission of the suspected crimes. *See Lacy*, 119 F.3d 742 ("the

12  affidavit stated Lacy downloaded at least two GIFs depicting minors engaged in sexual activity from

13  BAMSE, providing sufficient evidence Lacy actually received computerized visual depictions of

14  child pornography"); *Hay*, 231 F.3d at 634 (the affidavit "contains a good deal of evidence from

15  which the magistrate judge could conclude that the 19 files [containing child pornography]

16  transmitted via [File Transfer Protocol] to Hay's Internet address would be found on Hay's computer

17  system."). Moreover, in both *Lacy* and *Hay*, the search warrants were limited to the defendants'

18  computer system (not all electronics, as here), and for evidence of the alleged offenses. *See* Mot. at

19  14. Here, unlike *Lacy* and *Hay*, there is no factual allegation in the warrant establishing that

20  electronics were used in connection with the five money orders, despite the fact that the money orders

21  were available to Singh and he could have explained how he reached his conclusions about their

22  being "counterfeit." Therefore, the search warrant lacks nexus between the alleged crimes and

23  electronics, and it is overbroad.

24              **2.      Lack of particularity**

25  The government also disagrees with Mr. Powell's argument that the electronics provision,

26  which authorized the seizure and search of all electronics "used in connection with identity theft and

27  counterfeiting," SW Attach. B ¶ 11, lacks particularity. The government's argument seems to boil

28

POWELL MTN. TO SUPPRESS REPLY
*POWELL JR.*, CR 21–00070 RS

down to the fact that Singh did his best, noting the early stages of the investigation and the fact that

he limited the provision to electronics "used in connection with identity theft and counterfeiting" (as

opposed to all the offenses he listed in the warrant, SW ¶ 13) and to a three-month period. Opp. at 15-

17. However, without clear guidance to the executing officers about the nature of the offenses, the

warrant left it to the officers' imagination and discretion to decide how electronics could be used in

connection with counterfeiting or identity theft, contrary to the Supreme Court's long-standing

admonishment that "nothing [should be] left to the discretion of the officer executing the warrant."

*Marron v. United States*, 275 U.S. 192, 196 (1927).[7]

The government also claims that, because the warrant incorporated the affidavit, Singh's

boilerplate recitations in the affidavit that "counterfeiters will often use computers or other electronic

devices to design counterfeit Money Orders" and his claims regarding the "common practice[s]" of

individuals "involved in mail theft, access device fraud and identity theft," provide the required

particularity. Opp. at 17 (citing SW ¶¶ 12(a), (d)). That is incorrect. To support particularity by

incorporation, the affidavit itself must "list[] the items they may seize." *United States v. McGrew*,

122 F.3d 847, 849 (9th Cir. 1997); *see also id.* at 850 ("It is the government's duty to serve the search

warrant on the suspect, and the warrant must contain, either on its face or by attachment, a

sufficiently particular description of what is to be seized."); *United States v. Strand*, 761 F.2d 449,

453–54 (8th Cir. 1985) (no proper incorporation where "[t]he warrant does not in any way

incorporate the affidavit's listing of particular items reported missing.").

In other words, particularity by incorporation requires "specificity in the affidavit," such that

"[w]hen the affidavit accompanies the warrant, the person being searched has notice of the specific

_____

[7] The government is wrong, Opp. at 17, that the electronics provision here is analogous to the
provisions in *United States v. Hayes*, a case in which the defendant was suspected of prescribing
controlled drugs to his patients in violation of the Controlled Substances Act, and where the warrants
authorized the seizure, *inter alia*, of "all records which document the purchasing, dispensing and
prescribing of controlled substances, including, but not limited to, records contained in patient charts
and all relevant records required to be maintained by Title 21 of the Code of Federal Regulations,
Part 1300 to end and Sections 11190 and 11191 of the California Health and Safety Code." 794 F.2d
1348, 1355 (9th Cir. 1986). Unlike the electronics provision, the warrants in *Hayes* "articulated
standards that 'reasonably guide[d] the officers in avoiding the seizure of protected property" and
"did not permit them to seize any documents unrelated to controlled substances." *Id.* at 1356.

items the officer is entitled to seize," and "the discretion of the officers executing the warrant is limited." *Matter of Prop. Belonging to Talk of the Town Bookstore, Inc.*, 644 F.2d 1317, 1319 (9th Cir. 1981) (no particularity issue where the warrants commanded the executing officers "to seize only the above specified property as described in the Affidavits attached to this search warrant ..." and "to seize only those books, magazines, and films which depict the specific sex acts described in the Affidavits"). Contrary to the government's argument, Singh's affidavit cannot provide the required particularity by incorporation because it does *not* identify a list of things to be seized. Singh's boilerplate recitations about counterfeiters or regarding mail theft, access device fraud, and identity fraud are *not* lists of items to be seized, and they cannot cure the warrant's lack of particularity regarding electronics.

Finally, the government claims that *United States v. Holzman*, 871 F.2d 1496 (9th Cir. 1989), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990), is distinguishable because Singh's affidavit was limited to electronic devices "used in connection with identity theft and counterfeiting" whereas the warrant in *Holzman* lacked similar language that would have limited the officers' discretion in determining whether a property or device was "used or obtained through a fraud operations." The government is wrong. The alleged limiting language in both cases is highly analogous, and both warrants failed to give the executing officers any objective instructions when determining whether a potential item was used or obtained through the commission of the alleged offenses. *See* Mot. at 11. The electronics provision here, like the one in *Holzman*, lacks the required particularity.

### C. The provision allowing the seizure of "counterfeit money orders or Postal money order stock" is insufficiently particular

Finally, the government is wrong that this provision is sufficiently particular. The government does not address Mr. Powell's arguments, instead claiming that if store managers and ordinary citizens can identify counterfeit bills and counterfeit Western Union money orders, then postal inspectors can also do so. Opp. at 19 (citing *Carney* and *Duegaw*). Mr. Powell has already explained why the analogy to counterfeit bills, and to the cited cases, is unavailing. *See supra* Part I.C.2. As to the alleged ability of a store clerk to identify counterfeit Western Union money orders, the

government fails to acknowledge that in *Duegaw*, the search warrant authorized the search of

defendant's car for *one specific money order*, unlike here. 150 F. App'x at 803-04. Furthermore, in

addition to the store manager's suspicion about that money order, the affiant included significant

additional information supporting probable cause. *Id.* at 804-05; *see supra* Part I.C.2. *Carney* and

*Duegaw* are inapposite, and the provision here insufficiently particular.

### III.   The good faith exception does not save the warrant

Finally, the good faith exception does not save the search warrant here. It is the government's

burden to establish that the good faith exception applies. *Underwood*, 725 F.3d at 1085. An officer

does not manifest objective good faith "in relying on a warrant based on an affidavit so lacking in

indicia of probable cause as to render official belief in its existence entirely unreasonable." *United

States v. Leon*, 468 U.S. 897, 923 (1984). "An affidavit is so lacking in indicia of probable cause, or

bare bones, when it fails to provide a colorable argument for probable cause." *Underwood*, 725 F.3d

at 1085. "A colorable argument is made when 'thoughtful and competent judges' could disagree that

probable cause does not exist." *Id.* (quoting *United States v. Hove*, 848 F.2d 137, 139 (9th Cir.1988)).

The Ninth Circuit has "stressed that the good faith test is an objective one. We ask not what the

executing officer believed, or could have believed, but 'whether a reasonably well trained officer

would have known that the search was illegal despite the magistrate's authorization.'" *United States

v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006); *Weber*, 923 F.2d at 1346 (holding that the good faith

exception did not apply "[a]lthough we do not question the subjective good faith of the

government"). Similarly, that a magistrate issued a search warrant is insufficient to establish the

exception. *Kow*, 58 F.3d at 428-29 ("the oversight of two AUSA's and the approval of a magistrate"

are not "sufficient to establish reasonable reliance on the warrant" given overbreadth that rendered it

facially deficient).

### A.   The warrant is utterly lacking in indicia of probable cause of criminal activity

The good faith exception does not apply because, like in *Underwood*, the affidavit is "lacking

in indicia of probable cause, or bare bones." 725 F.3d at 1085. The Ninth Circuit held "[r]eliance

upon a bare bones affidavit is never reasonable," "[e]ven if the extrinsic factors point to

reasonableness." *Id*. at 1087.

The government incorrectly claims that "the only information" provided in *Underwood* "was that law enforcement had observed 'a baggie of a personal-use amount of marijuana' in his home and observed him deliver two wooden crates on one occasion three months before the warrant application." Opp. at 21. What the government does not acknowledge is that these are the two facts remaining *after* the Court discounts all the conclusory allegations and foundationless expert opinions in the search warrant affidavit. *Id*. at 1082-83 ("the affidavit in Underwood's case includes only two facts, foundationless expert opinion, and conclusory allegations."). The same process should be applied here, and similarly would leave an insufficient basis for probable cause. The affidavit in *Underwood* was more than four and a half pages and referenced the 102-page signed federal affidavit that permitted Underwood's arrest and a search of his suspected residence (which turned out to be his mother's house, leading to the state warrant at issue), the DEA's investigation, "intercepted conversations," surveillance observation, and years of specific training and experience involving drug trafficking. *Id*. at 1078-80. Underwood was identified in the affidavit as "a courier for a multi-hundred thousand pill MDMA drug trafficking organization." *Id*. at 1079. On a specific date, DEA and local police observed Underwood deliver two wooden crates to "known coconspirators." *Id*.  The affiant reported a DEA agent's belief that the crates contained approximately 260,000 ecstasy pills based on "the other seizures in the investigation." *Id*. These insufficient "conclusory statements" from a highly experienced agent immersed in an extensive investigation have more indicia of reliability than the Westamerica employees' conclusion that the postal money orders were "counterfeit" and/or "not valid," which was reported to the affiant without any underlying facts or further corroboration by the affiant. Like in *Underwood*, as previously discussed, *see supra* Part I.D., the affidavit here also provides no factual basis for the conclusion that evidence of wrongdoing would be found at the suspect's home. *Id*. at 1086.

The case here is also analogous to *Weber*. In *Weber*, the Court found that "nowhere in Burke's affidavit is there even a conclusory recital that the evidence of Weber's interest in child pornography—consisting of one proven order—places [Weber] in the category of those pedophiles,

molesters, and collectors about whom [the expert] has expertise." Here, too, Singh fails to recite any evidence that would place the suspect in the category of "counterfeiters" (nonetheless mail and identity thieves) about whom he asserts expertise. As in *Weber*, the foundationless "training and experience" section "may have added fat to the affidavit, but certainly no muscle. Stripped of the fat, it was the kind of 'bare bones' affidavit that is deficient under *Leon,* 468 U.S. at 926." *Id.*

The Court need not question the "subjective good faith of the government," nonetheless find misconduct, to find that it acted unreasonably in preparing the affidavit. *Id.* at 1346. Furthermore, here "there was no need for 'hurried judgment' upon which law enforcement decisions must often be based." *Weber*. 923 F.2d at 1346 (finding time pressure an invalid excuse for an incomplete affidavit when the government controls the search's timing) (citing *Leon*, 468 at 913).

### B.   The warrant is utterly lacking in indicia of probable cause that evidence of the alleged crimes would be found on electronic devices

Even assuming *arguendo* that the warrant provides a colorable argument of probable cause of counterfeiting, it still fails to support a colorable argument that evidence of that crime would be found on *the electronic devices* seized.

It bears repeating that "[p]robable cause to believe that a suspect has committed a crime is not, however, by itself adequate to obtain a search warrant." *United States v. Ramos*, 923 F.2d 1346, 1351 (9th Cir.1991), *overruled on other grounds by United States v. Ruiz*, 257 F.3d 1030 (9th Cir. 2001). In addition, [t]he affidavit must demonstrate "reasonable cause to believe that the things listed as the objects of the search are located in the place to be searched." *Ramos*, 923 F.2d at 1351. And when a warrant lists multiple places to be search, the search warrant must establish the required nexus as to *each* of those places. *Greenstreet*, 41 F.3d at 1309. Therefore, if the search of a particular place listed in the warrant is not supported by a colorable argument that a crime was committed *and* that evidence of that crime would be found in that particular place, then the good faith exception does not apply. *See Hove*, 848 F.2d at 139-40 (although warrant authorizing search of a residence and two cars was supported by probable cause that Hove sent threatening letters and planted pipe bombs, it was not supported by probable cause that evidence of the crime would be found at the residence and the good faith exception did not apply to the search of the residence); *United States v. Holzman*, 871 F.2d

1496, 1511 & n.4 (9th Cir. 1989), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990) (where search warrant authorized the seizure of five categories of things to be seized, "[t]he evidence purported to justify the search for bonds was so tenuous that no reasonable police officer could have believed that portion of the warrant was supported by probable cause. Therefore, the 'good faith' exception to the valid warrant requirement . . . cannot be applied to overcome this warrant's deficiency as to bonds.").

For the reasons explained above, "thoughtful and competent judges" cannot disagree that the "underlying facts" in Singh's affidavit, *Underwood*, 725 F.3d at 1081, fail to establish a non-speculative connection between the alleged criminal activity and electronics. The only potentially relevant "training and experience" boilerplate assertion – that "counterfeiters will often use computers or other electronic devices to design" and print money order is irrelevant given Singh's failure to provide a factual basis that the five money orders were so "counterfeited." *See, e.g.*, *Luong*, 470 F.3d at 903 (the good faith exception did not apply where, *inter alia*, "[t]he affidavit fails to set forth a factual basis for linking Jao to the allegations contained in the tip," and "[a]lthough the government argues that Luong and Jao's comings and goings from the house to the backyard support a theory that methamphetamine production was underway in the garage, the affidavit does not allege (let alone set forth evidence) that methamphetamine operations are commonly set up in residential yards, or that Luong's garage was accessible through the backyard"); *Holzman*, 871 F.2d 1496, 1511 & n.4 (rejecting good faith exception for search for bonds where "[n]either bonds nor notes were mentioned or discussed as part of the fraud scheme in the affidavit").

Notably, by the time Singh drafted his affidavit, courts—including the Supreme Court—had stressed the unique nature of electronic devices and the implication for privacy interests, Mot. at 12, and the Ninth Circuit had specifically cautioned that "law enforcement and judicial officers must be especially cognizant of privacy risks when drafting and executing search warrants for electronic evidence." *United States v. Schesso*, 730 F.3d 1040, 1042 (9th Cir. 2013). Singh's affidavit utterly failed to heed this admonition. Not only did the electronics provision lack any factual support in the affidavit, but it authorized a general rummaging through *all* files and data on *all* electronics for three

months, without any content or other limitation designed to ensure that only evidence of designing

counterfeit money orders would be seized. On these unique facts, the good faith exception does not

save the search of electronics seized from the residence.

## CONCLUSION

For the above-mentioned reasons, the Court should grant Mr. Powell's motion and suppress the

evidence derived from the November 21, 2019, search warrant.


Dated:      December 14, 2021                          Respectfully submitted,

                                                       GEOFFREY HANSEN
                                                       Acting Federal Public Defender
                                                       Northern District of California


                                                                  /S
                                                       SOPHIA WHITING
                                                       CARMEN SMARANDOIU
                                                       Assistant Federal Public Defenders